30216 Raylin Richard v. Anadarko Petroleum Corporation and Offshore Energy Services v. Liberty Mutuals Good morning. May I proceed? You may. I'm Judy Barrasso for Liberty Mutual. I apologize on the front end. I'm suffering from a little bit of laryngitis, so hopefully you'll be able to understand me. We are here on two distinct issues, and I'm first going to talk about the reformation issue and then get to the defense cost issue. The first issue is whether, under federal maritime law, an unambiguous contract, indemnity contract, may be reformed to give it a broader-than-usual meaning after a loss has occurred to great coverage. And we submit the two panels of this Court already have looked at this in similar cases, in the American Electric case and the Wilcock case, and have said definitively that you can't use the reformation argument to get around the rule, that you can't use parole evidence to find somebody's intent with an unambiguous contract. Well, Counsel, it seems to me the parole evidence rule is exactly what a reformation is an exception to, that if you have an agreement of the participants to a contract, that we said black when we meant white, that can be proven. And the parole evidence rule is no bar to that in general reformation, is it? Well, there's two questions in response to that. One is, under maritime law, is that allowed? But — Well, under maritime law, there is no law of reformation. I thought folks agreed. So you look to general principles of reformation. And what I just said, I think, according to the restatement, is a general principle of reformation. And I think the principle is a reformation, is that you can't use that process to avoid the general rule of looking to intent, and you have to go have a clerical error in a prior agreement and improve that by clear and convincing evidence. Well, there's a very limited understanding of reformation, that it has to be a clerical — well, clerical error in that we said something that we did not intend to say, if that's what you mean by clerical error. Or let — I mean, one of these cases has to do with leaving a name off that was intended, a number of a policy or whatever it is came in and what the number was. If that's what you mean by clerical error, but it seems to me a misstatement. Everybody looked at it a hundred times and thought the word not was there and didn't see it, and didn't — but it really wasn't there. I mean, that's the kind of thing reformation is — I'm going to say every day, reformation is not an everyday remedy. But it seems to me you have a very crabbed understanding of reformation. Well, as you — I shouldn't have used that word, because you're too kind a woman for me to use that. But a very limited understanding of reformation. It's a very — it's an extraordinary remedy to reform a contract, very limited. And as the — this Court has said in American Electric and in Wilcox, this is getting to the clerical error issue, you can't use reformation to take a term and give it a broader than usual meaning under the guise of reformation. Well, just looking at American Electric, among the things we said here is there's no indication that one of the parties knew or should have known of this alleged error. I mean, you need a mutual mistake that needs to be corrected. And it wasn't mutual in American Electric. Well, in American Electric, the party — the two parties to the contract were alleging it was a mutual mistake. You had Chubb and the insured saying it. The affiliated was the insurer that had assumed obligations — You got me there. — just like Liberty here, had assumed obligations that would be affected by that So now we say it's a mistake, a mutual mistake. And the Court said several times, that's not the type of error. That's not a clerical error. In the other cases, like the Samuels case, the number of the policy was incorrect. And they noted that State Farm knew that number was a nonexistent policy. I mean, that was a clerical error. But changing a term like here, what happened was you had two sophisticated parties entering to an agreement with indemnities. And all the time in the oil and gas industry, you have oil — you have indemnity provisions, but they're different. There's no one-size-fits-all provision. And here, for whatever reason, they left — They, in other parts of the contract, reference contractors. They reference subcontractors and contractors. But it's not in that provision. And it's not in other contracts that are in the record. And that gives the contract a very different meaning. So you're — and initially, they argued, well, subcontractors should have that broader meaning. Just like happened in American Electric. They tried to come to the Court, expand the meaning of that term, saying that was our intent. And the Court said, no, it's unambiguous. You can't do that. So then they came back to American Electric and said, well, let's just reform it, which could happen in every case now. And in American Electric, where the two parties to the agreement now together said, oh, yeah, we didn't mean that, the Court said, no, you can't do that. And you can't do it because you have a party here that had assumed obligations under the contract. But I thought the assumption of the obligations on the contract must be a knowing assumption in reliance on the limitations as originally written. In American Electric, there's no — It's just to say that, but I don't think that's the general law. Well, in American Electric, there's no evidence that affiliated actually looked at that specific contract. It assumed it happens all the time, and it's happened here. You assume obligations under a contract. And the Court in American Electric specifically said they hadn't identified any case where a third party had assumed an obligation under a contract, and then it subsequently reformed. Its unambiguous terms changed. And the Court said that would be contrary to the basic norms of fairness and notice. So that's our first reason why it's not the type of error that can be reformed. And that's what we learned from American Electric and Wilcox. And then secondly, even if they got past that, here they didn't meet the burden of proving clear and convincing evidence that there was an antecedent agreement that if you look at Judge Drell's decision, his ruling, he says, well, I find their intent was this, or I find their intent was to have that. And I'm going to talk about that in a minute. But what he never found was there was an actual antecedent agreement. He says, well, the master service contract was the agreement. That was a mistake, according to this reformation process. But what was the — where's the evidence of any negotiation where they talked about what the scope of indemnity would be? And we — Kennedy, I think the principal evidence was the Thibodeau factual situation. What do you say to that? The principal evidence was the previous event of the Thibodeau coverage. Which is post-formation. I mean, that was post, you know, formation. It does show the understanding, because there's no objection to it at the time. There would be an indication of the understanding at the time. But so what do you say to — But what they don't have is, like, one shred of evidence showing that at the time they were entering into this contract, their intent was to have this broader-than-usual indemnity. Well, then, the first time they apply it, which you might infer, therefore, meaning that was their intent at the time. So the first time they apply this language, they do cover Thibodeau. Now, tell me, is that a similar, identical situation to what we're dealing with here? Your Honor, that — there's not — there's nothing in the record that really describes that in total. I mean, there was testimony that that occurred after the agreement, sometime after the agreement, but there was no discussion or evidence about all the circumstances. And what we've shown — But you're maintaining that's no evidence of what their intent was with regard to — Correct. It was post-formation of the agreement. And in all the cases where a court has found antecedent agreement, there's at least somebody that has come forward and said, well, at the time we discussed this. At the time we said this is what we meant. And they don't have that here. Getting back to my question, though, what I was asking is, is the Thibodeau example — how would you distinguish the Thibodeau example, or had you finished your answer by saying there's just not enough in the record to tell you the necessary facts of that? Yes, Your Honor. I don't think there's enough in the record. I mean, the argument has been, and I think that that was somebody else's, another contractor's employee, and it was paid. But you don't know the circumstances. And sometimes things are paid for lots of other reasons, as Judge Doherty mentioned. You can have a business decision at the time between the parties which says, well, maybe I better pay this and move on to keep some other business. That doesn't mean that's the intent that was — went into this contract years ago. And I thought your other point was that you can't even — that's not even evidence of what happened before the contract. It's after the contract. No, it's not evidence anyway. Exactly. And all the cases have evidence of we had a discussion, or we intended this. It's a narrow thing, and it would only apply if you had evidence of mutual misunderstanding. And in the cases like where they found a clerical error, they said, look, we didn't — those numbers are wrong. Here's our documents that show the right policy number. Or in the Weaver case, where they were reforming what a certificate — how a certificate of deposit would be distributed upon death, they went back, and the person that was involved in issuing that gave evidence of the testimony with the decedent of the intent. We don't have that here. So is it your view, then, that if you're looking at a claim of mutual mistake — and I know your position is that parole evidence ought to be barred, but if parole evidence is considered, it has to be limited to evidence which occurred prior to the agreement. Well, you have to have — You can't look at any post-agreement evidence as in support of a contention about what the party's intent was. Well, it certainly can't be the sole evidence. I'm not saying it's necessarily always irrelevant. But you have to have proof of the prior agreement, the antecedent agreement that was made before the mistake occurred in the master service contract. And you can't leap to something that happened after that, one incident, and say, well, here, nobody objected, because there's lots of reasons why that could happen. And we pointed out — and what Judge Drell relied on to say, oh, well, he said they intended to have this broader indemnity because there's knock-for-knock indemnities in the reciprocal. But there's plenty of cases in this Court and elsewhere with different types of indemnities and different layers. And we cited cases where it talks about if you want to indemnify somebody else's other contractor, you need to say that. And they do say it. And there's the Fifth Circuit case in Campbell. We had a law review article that we cited that says if you want to cover the company's other — indemnities owed to other people, you need to say that specifically. It's not just in there. And they just didn't do it. And there's reasons not to do it. Kennedy. Counsel, we've kept you on reformation a good bit. Do you have something else to tell us? I do. And that was my argument also, that they didn't have the clear and convincing evidence. I did want to talk about the defense issue, because that's the second argument. And Judge Drell there committed three errors in reaching his conclusion that Liberty Mutual owes 100 percent of the defense costs. He, first of all, he construed these endorsements in a way, endorsement three, endorsement 34, in a way that wrote out of endorsement three a whole provision. And the law is, that's not a reasonable interpretation when you have to strike out portions of a policy. And you don't have to do that, because it's not a conflict, and you can give effect to both parts of it. And if you look at the policy form, you have the part about supplementary payments. And endorsement three changes that and provides that we're paying all the expenses, the categories, all the expenses are being paid, but then the insured, you're splitting, you're splitting it with us, and here's the formula. And that amendment to endorsement three is in effect whether or not you have endorsement 34, because the language they seize upon, pay all expenses, we incur, is in there. And even when endorsement three is amending the policy, it doesn't strike that. It just adds the formula and the agreement to pay part of it below it. If you prevail on this argument, would we remand for the calculation of the pro rata share? The calculation, I think, was in the record. And we don't need to remand? You don't have to. The calculation was that if you agree that this apportionment should apply, then Liberty shares 168,695.96. If you agree with us that the reformation was improper, then we argue we don't know anything. We don't know anything. But if you win on this backup argument, then numbers are here, and so we didn't remand. Yes. But if you agree with us on the reformation, then we argue we don't know anything. We don't know anything. I understand. That's your primary argument. No. And then the other two reasons that Judge Roehl was wrong, because he leaped to the conclusion these were two reasonable interpretations, and therefore it's ambiguous. And under Louisiana law, to consider this issue, under Louisiana law, you can look at each post-formation conduct to see how the parties treated it. And there is evidence in the record that nobody disputes that prior to this, the insured paid its allocation of defense costs. And the final argument is that you also he also construed all this against the insurer, and we cited this Court has said that rule doesn't apply when you have sophisticated parties, particularly with insurance brokers. Thank you. Thank you for your notes. Good morning, Your Honors. Jeff Tillery on behalf of Offshore Energy Services. I thought I might, if with the Court's indulgence, just simply address the three major points that the Court just addressed with Ms. Barrasso. Point number one, parole evidence. At page 37 through 39 of our brief, we cited all of the case law which specifically holds parole evidence is admissible in a reformation situation. Number two, with respect to American Electric and the Wilcox case. Both completely distinguishable. Very simple. Distinguishable on the facts, but it seems to me the language Ms. Barrasso is talking about is there. To use my crab word, I think there are very limited interpretations of reformation. I think maybe incorrectly, but nonetheless, they are there. So you can distinguish the facts all you want. What about the holdings in the case? Sure. What about the language about the unfair, that this would, to allow this reformation, this working backwards, to allow this reformation to interfere with somebody like Liberty Mutual, goes against all the regular understanding of equity. Do they look to whether the insurer knew about the contract language? I don't think that's in American Electric. In American Electric, the insurance company, and I think that's part of the holding, Judge, the insurance company relied on the contract. Well, but it doesn't say it looked at the contract, does it? I think the word is rely, isn't it? The word is rely. They relied on the existence. All I saw is they were relying on the existence of this contract when they issued the policy. Exactly. You used the word fairness, Judge. That's the word fairness. Reformation is an equitable remedy. In that case, the Fifth Circuit said it would be unfair to put the hurt to an insurance company that relied on the contract. Didn't the insurance company rely here, even if they didn't read it? Absolutely not. They still relied. No, Judge. Hear me out on this. Here's why. You're distinguishing. Yeah, I will. Absolutely. I'll do my best. In this case, the insurance company not only did not ask to look at the contract, in answers to discovery that's submitted in this case, the insurance company admitted they wouldn't have charged an additional premium if the word contractor had been in there. They did not charge an additional premium for this. It didn't affect anything that they did. If that word contractor had been in that contract, premium would have been the same. Everything would have been ruled. They would have covered us. This is a technical way they're trying to get out of this. But it doesn't mean that they can't rely on the contract. None of that says what prior negotiations are in the record that show that this, and I don't think that there are any, that show that there was some other intended contract? Could you repeat that? What prior? There was some other? What prior? What evidence is in the record that there was some other intended contract and that everybody meant to say not, where they didn't say not, or where the numbers are wrong, or the policy referenced is the wrong case? Where is that evidence? Unrebutted evidence of Sam Broussard, the man who signed the contract, at that time, had no testimony from him that they intended this to be knock for knock and to cover the contractor in this particular instance. Unrebutted testimony from the broker. Well, just a second there. You're talking about current, what's current with this case, a statement from somebody who said at the time that's what we meant. But is there any evidence? I thought the case law was the evidence has to come from that time period, not just somebody remembering what we had in mind. Understood, Judge Sotomayor. No, I'm not. Is that correct? No, I understand. In general, Sam Broussard signed the contract, so Sam Broussard was involved in the negotiation for the contract. He may have testified afterwards, because that's the only way you knew. He may have testified afterwards. No, you can have contemporaneous documents at the time the contract was being done. That's the normal situation where you would say, like the example with the numbers being wrong. Those are contemporaneous at the time that the thing is. Is there anything in this record from the time period that the contract was being adopted? Other than the testimony of Falanga, Broussard. That's not testimony they gave at that time. That's testimony they gave now about what they were thinking or doing at that time. And it's unrebutted. I got it. I understand your question. Were there e-mails back and forth of negotiations, I guess? Right. Were there documents? No. Absolutely not. There's no. No evidence whatsoever of that time period. Except unrebutted testimony. Of today. That's … But that's … Judge, what if you and I … Oral evidence of something. Go ahead. Go ahead. Oral evidence is admissible to demonstrate. What if I agreed to cut Your Honor's lawn today? We may not. And the intent of our agreement is something we discussed orally before I signed a contract to cut your lawn. Okay? So that oral … Counsel, if you might want to stay behind the microphone. You're very good with your marching around. I apologize. We're recording this. Well, let me ask you, what case is there that would allow us, that we can say, all right, this case says, so long as somebody testifies as to what their intent was at the time, even they're testifying five years later, you're good to go. Has it gotten in case like that? Other than … No, I don't. The direct answer is no, other than oral testimony of the people involved in the deal that Judge Drell was unrebutted. The answer to your question is I do not have e-mails. I don't have contracts that you've asked for. I do not. I mean, your people are probably, I mean, testifying honestly, have no reason to think otherwise. Their memories might have been faulty or, you know, certainly testifying from their perspective. But all I'm worrying about right now is what is the law? Does it seem we can use that information or not in using this? And you've told me what cases you have to support that. How else … That's a fair question, Your Honor. I'm going to stay here. How else am I going to prove this antecedent agreement that we're talking about? How else am I going to prove it? Because it's hard. It's supposed to be hard. Sure. I understand that. Reformation is highly unusual. So my question is, Your Honor, where is the testimony or evidence to rebut the oral testimony of Sam Broussard and Falanga? There is none. In fact, Anadarko and OES both agreed, unlike in the Wilcox case, they both agreed to the intent of this contract. That's the distinguishing factor of the Wilcox case. In Wilcox, Wildwell, the two people to the contract, did not agree to exactly what was happening, okay, with respect to the intent. Here, both Anadarko and OES agree that was the intent. And, Judge, you hit the nail on the head on the Thibodeau case. Two years after we formed this contract in 2000, two years, OES assumed the defense and indemnity in the Thibodeau case. Thibodeau was an employee of OES, just like Mr. Richard. Diamond Offshore was a contractor of OES, just like Smith and Dolphin in this case. Exactly the same situation. OES assumed the defense and indemnity, paid it. But there's not a stop to deny that that's the contract. There's no sort of because they paid it. Why is that evidence against at the time of the Reformation anyway? Of course. What case says you can use that evidence? A course of dealing can certainly indicate intent, Judge, and it's unrebutted. Why didn't Liberty Mutual chose to accept? Basically, Liberty Mutual made a strategic decision in this case not to rebut all of the testimony that Judge Drell listed. I just don't understand how that's persuasive evidence of anything. Because it's a one-off that you pay and you can have business reasons to pay, as Judge Dougherty said. How is that any persuasive evidence at all? Because course of dealing can reflect intent, and I would agree with you if somebody had submitted some evidence that said, well, they paid this because of business reasons. Absolutely, I would agree with you. If Liberty had come forth with evidence to rebut that course of dealing to reflect intent, then sure. But in this case, Liberty Mutual chose to go with strategy and to simply argue parole evidence is not admissible. None of the things that Judge Drell relied upon was rebutted by Liberty Mutual in this case. But isn't knock-for-knock indemnity schemes fairly common? Absolutely, Your Honor. And what happened in this case was in 2000, Anitarko and OES enter into this agreement, and it's to govern their relationship for years to come. And there's no doubt clear the intent, and Falanga and Broussard testify to this, that Anitarko says to OES, hey, OES, if any of our employees get hurt, we will cover you and the people you bring out to this rig. Okay? That's so they can get insurance, they can predict things. OES says the same thing to Anitarko. Hey, Anitarko, if any of our employees, like Mr. Richard, get hurt, we will cover you, Anitarko, and anybody you bring out to the rig to get hurt. In this particular case, Judge, they forgot the word contractor. And we have expert testimony in the record that is unrebutted on that point, too. The expert says this is common in the industry, unrebutted by, and logic dictates why would OES agree to indemnify a subcontractor and skip the main contractor? Why would they do that? It's not a logical. I guess you could. I agree that you could. But logic would dictate under the NOC for NOC scheme, you can look at circumstantial evidence, that you wouldn't just skip the contractor. Further intent is the Thibodeau case, why they picked up the contractor. They forgot to use the word contractor. That's it. Bottom line. And all of the evidence that Judge Drell considered is unrebutted. Does the restatement contemplate the use of this type of evidence? I think it does, Judge, because it says parole evidence. And that's the best I can give you. I think, is there a case I can just nail you, give you with? I can't. I can't. All I can say is circumstantially, based on the unrebutted testimony and the custom in the oil patch, prior course of dealing, the broker's testimony, the expert testimony, Liberty didn't rebut any of that. Look at the entire picture equitably. I understand it's hard. I get reformation is hard. And I know Judge Drell looked at this carefully and wrote a carefully crafted decision. But at the end of the day, the equities, could this be a fraud? Could these guys have come in and tried to put the hurt to the insurance company and somehow concocted all of this? And I understand that's why there's a concern about reformation. I get that. But no, not in this particular case. There's no evidence of that in this case. They did it in past course of dealing. Biggest part of that part, why it couldn't be a fraud or a trick on the insurance company to get insurance, the biggest part of that, I think, is the evidence that Liberty didn't care. Liberty didn't ask to look at the contract. The broker testified at page 12 of our brief that many of the insurance companies, when he places insurance, he takes that contract, he gives it to the insurance company, and why is that? And so the insurance company can assess the risks to determine, hey, Liberty could look at that contract and say, wait a minute, you're going to insure subcontractors and contractors? Hmm. I need to charge an extra premium there. You're going to insure subcontractors, contractors and employees and agents? You need to charge an extra premium there. That's why you give it to insurance companies for that. Liberty didn't care here. Liberty didn't ask for it. The premium was going to be the same, and they didn't rely on it. And that's why I think Judge Drell was correct in his decision. Can we talk about endorsement 34? All I can say, yes, I appreciate that. Endorsement 34 specifically says it replaces, the word replaces, the supplementary payments total. And all I can say about that is, if it's ambiguous, 100% evidence that it's ambiguous in this case is Liberty Mutual, to the trial, had to bring a witness to testify as to the intent of that particular insurance policy provision. So clearly it's ambiguous. Clearly it ought to be construed against Liberty Mutual for all the contractual reasons laid out in our brief. But more importantly, I guess that was my first argument, it's ambiguous. It's not ambiguous. If you read endorsement 34, it says replaces the supplementary. The word replace is the key at the end of the day. Replaces it. So if it replaces the supplementary payments, it's not that it's full. It's the full attorney's fees. It's not the little form. Were all of these endorsements presented simultaneously in connection with the policy, or did they dribble in in numerical order? You got one first, then two, then three. Because what we're talking about is the tension, I guess, between number three and number 34. Do you know how that occurred, how it unfolded? I wish I could tell you. I cannot answer that. If I knew the answer, I would tell you. I can tell you that's not in the record, how it came in. But what's in the record is convoluted testimony of a liberty mutual witness. So you have three which says amend, and then 34 which says replace. So amends, replace, I say conflict, ambiguity, we win. That's sort of my argument. Why shouldn't you interpret them to give them both meaning, as we normally do in a contract? Why shouldn't that rule apply first? Before you get into ambiguity, conflict, why shouldn't you do the normal contract rules and say give them both meaning? That rule in the hierarchy comes first. I'm thinking how to answer that. Because the word in the supplementary in 34 says replace. The other word says amend. And then you have supplementary payments up here, you have amend and you have replace. I guess the argument would be the amendment portion comes after 30. The amendment was first, and then 34 is next, and I'm being told what to say. The colleague hasn't helped. Clearly. You cannot reconcile those two. The word replace cannot be read together with the word amend, and that's all I can offer. But isn't a logical reading then that you wouldn't amend something only to then replace all of it? Yes, Judge. Not logical. That should have been my argument. That should have been it, but that is now. You can't amend something. You cannot amend something and then replace. The words just don't match. I guess you can't really read them together is the best I got. You can amend and then replace. But that's what you're asking us to do. Want us to apply 34? I want you to apply 34, but you can't reconcile them, Judge, is what I'm saying. You can't reconcile them. If that's the case, you can't reconcile them. It's ambiguous and you have to construe it against Liberty Mutual pursuant to the law. Because they drafted it. It's their insurance policy and that sort of thing. That's it. But there is testimony. I find endorsement 34 to be duplicative, the supplementary payment section, of what was already in the contract and the policy at page 8 with very minor changes. It already had said, well, before you get pagination to the endorsements, that we will pay all expenses we incur and wherever else. The only change I see has something to do with subpart E, all costs taxed against the insured, and then took out language about attorneys. Was that — I mean, so replace, it hardly seems to me, it duplicated it to put the same language about all expenses we incur that was already in the policy before you get to endorsement 3. Was there any discussion of that in the record? No. I don't think there was any discussion of that other than the testimony of one Liberty Mutual witness who tried to explain replace versus amend. And I, again, go back to if you need a witness to explain the details of the contract, it's got to be ambiguous. Okay. Thank you, Your Honor. Oh, go ahead. If we are not persuaded by your argument in this regard, can we render on the $168,000 amount, or is there some remand necessary? Yes, Your Honor. I think you could. If you're not persuaded by my argument, I hate to admit it, but you can. Yes. I would have to agree. We've got to buy Reformation, but we then don't have to. I think you need to agree with me on Reformation, Your Honor. We can't totally disagree with your argument. Could I mention one thing? Because I really ask the Court to look carefully at the equities of the situation and why Judge Drell did this, because I have a minute. And if you look at Wilcox, Wilcox happened to be my case. That was, believe it or not. Good for you. What I remember about Wilcox, I was urging Reformation in that case, and I lost, because I represented Wildwell in that case. And in that case, Wildwell was seeking to reform a contract with a contractor, and that contractor, against my client Wildwell, didn't agree with me. I said the contract said X, and that contractor wouldn't agree to it. He said, no, it didn't say X. You're wrong. This is different. Anadarko and OES both, everybody agrees that they meant totally different than Wilcox. Number two, American Electric, if you look at carefully the equities of the situation, the insurance company relied. And at the end of the day, that's what happened in American Electric. The opinion actually says that. It's got the word belied, but it actually looked at the underlying later-to-be-reformed agreement. Your Honor, I'd ask the Court if you get a chance to take a look at that. And the Frug case in the Fifth Circuit also talks about parole evidence. But, yes, the tenor of American Electric is reliance. And if you think about it. Tenor. If you think about it, Your Honor, it's equitable remedy. It's all about fairness and equity. And the strategic decision by Liberty not to rebut all the stuff that we put in here means Judge Drell was right. There's nothing in the record to say he was wrong. Nothing challenging what he did. Nothing at all. Thank you. Thank you, Your Honor. I think in fairness to opposing counsel, you should have spoken more softly for us. Hopefully I can speak a little bit. Let me just respond to the last comments about the equities. As the Court pointed out in American Electric, the norms, the basic norms of fairness and notice are what are important. And it's not enough to say, well, we should just reform this contract. Because there's an insurance company and this loss arose. Whatever. You would be presented with lots of cases where people come up. There's a basic norm of fairness and notice that contracts can't be willy-nilly reformed. And here. And you don't have to show reliance. You know, looking at American Electric, it nowhere says that affiliated insurer relied, ever looked at that document. It assumed the obligations of the prior contract. And the Court even said that the plaintiff had identified no case where a third party has assumed the obligations of a contract and a court has reformed it. And that's why they said that was the end of the story in American Electric. And that we think should be the end of the story here, because, again, it's not the type of clerical error. And getting back to the other. But you don't dispute that this knock-for-knock scheme is very common in the industry? You don't dispute that? I agree with that. But they're different. There's no one-size-fits-all. And I'd ask you to look at the Dolphin contract, which is in the record. It's a contract between Anadarko and Dolphin, one of the parties here claiming indemnity. But in their agreement with each other, they do make some distinctions where Anadarko has a broader indemnity and is paying, and it's getting, make sure I get this straight, the contractor, Dolphin, only has to worry about its line, its subcontractors, its employees. Anadarko has agreed to pay the contractor for its contractors. So in that contract, it's different. Anadarko accepted a broader obligation because Dolphin, which is in the shoes of OAS here, maybe pushed back and said, I don't want to pay for your contractors. You're bigger than me. And here, that could have happened here. There's no testimony about it, as Judge Elrod asked again and again for. There's no documents to show what, if there was any discussion as to why this was in the contract that Anadarko wrote that left off its other contractors. And there's plenty of other cases we cited where there are indemnity agreements with that language. So there's nothing here to show it was a mistake other than now, after the fact, they're saying, oh, we want it now. Because in all their contracts, they say contractor, subcontractor. And in Dolphin, it's different. So I don't dispute that there were indemnities, but it was like this and not the whole tier. It didn't go up and down the tier. And Mr. Tillery, when asked, he said, well, the evidence proves intent. But that's not the question. That parole evidence, you don't use it to show intent. They're using it to prove a mutual mistake. And there has to be something of discussion between Anadarko and OES. What are we doing here to show a mistake? Roberts. Are you saying the case law is clear that there must be, it seemed to me it would have to be documentary evidence, because otherwise all you're talking about is testimony about what I believed at a certain time. Do you think the case law is clear, and what would you point me to, that there must be documentary evidence contemporaneous with the execution or execution preparation of the contract? Well, the case law that we cited, first of all, they uniformly say it has to be clear and convincing evidence. In every one of the cases where Reformation was granted that they talk about, there was some evidence of what happened before, not just saying. Had only testimony, and the Court said that was not enough? Was there any case like this, that all there was was after the fact testimony and the Court said it has to be something, that we reject that because it must be documentary evidence from the time? The Wilcox case, which was also decided on this is not the type of clerical error to reform, noted there was not adequate evidence of a mutual mistake, because they were coming after the fact. And I think what's missing here is any evidence that shows a negotiation or discussion or something before the agreement was signed. And the evidence shows Mr. Broussard admitted that when he got, that the document came to him as it was, and they signed it. There was no prior discussion. And so he signed a document that didn't include contractors, and now he says, well, oh, I wanted it. But he never, he's sophisticated. They signed lots of these agreements. Wouldn't he look at it and go back or find it? And it's not just in this document. It's in the Smith document. And just real quickly on the endorsements, Southwick, the endorsement 34, as you pointed out, it doesn't change the language of the supplementary payments provision. It still says we pay, it still has the same first paragraph. They've got a little change later. Right. It struck out the second paragraph, supplementary payments, which dealt with the contractual liability stuff. And it changed one other part, but it didn't touch the paragraph that we're, that they're saying is the conflict. And the conflict was there, according to them, in the policy, and then it wasn't touched by endorsement 34. And endorsement 3 is intended, it just amends that and says specifically this is to change the insured's liability for supplementary payments and amends it. So it would come under that, under that paragraph. It wasn't striking it or changing it. It's adding it. And that's how you read every provision into the policy, which you have to, to make it reasonable. The way Judge Rell did it is not a reasonable interpretation. Thank you. We have your argument. Thank you. We appreciate your.